UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

LORI BOX, o/b/o P.B.P.,                )
                                       )
              Plaintiff,               )
                                       )
         v.                            ) No. 2:10CV28 FRB
                                       )
MICHAEL J. ASTRUE, Commissioner        )
of Social Security,                    )
                                       )
              Defendant.               )


**<u>MEMORANDUM AND ORDER</u>**

        This cause is before the Court on appeal of an adverse
decision of the Social Security Administration.  All matters are
pending before the undersigned United States Magistrate Judge, with
consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

        On October 3, 2007, plaintiff Lori Box filed an
application for Supplemental Security Income (SSI) pursuant to
Title XVI, 42 U.S.C. §§ 1381, <u>et</u> <u>seq.</u>, on behalf of her son, P.B.P,
in which she claimed P.B.P. became disabled on September 1, 2007.
(Tr. 86-88.)  On initial consideration, the Social Security
Administration denied plaintiff's claim for benefits.  (Tr. 35, 48-
52.)  On May 15, 2009, a hearing was held before an Administrative
Law Judge (ALJ).  (Tr. 1-27.)  Plaintiff and P.B.P. testified and
were represented by counsel.  On June 12, 2009, the ALJ issued a
decision denying plaintiff's claim for benefits.  (Tr. 36-47.)  On
February 22, 2010, the Appeals Council denied plaintiff's request

for review of the ALJ's decision. (Tr. 28-32.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. Testimony of P.B.P.

At the hearing on May 15, 2009, P.B.P. testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, P.B.P. was eight years old. P.B.P. had just completed second grade. P.B.P. testified that he attended a special class at school for reading, but for no other subjects. (Tr. 5-6.) P.B.P. testified that another teacher helped and stayed with him throughout the school day. (Tr. 7.)

P.B.P. testified that he has meltdowns at school when he loses his temper. (Tr. 9.) P.B.P. testified that he has meltdowns every day at school at which time he leaves the school and walks around the building to "get the anger out" and calm down. (Tr. 11.) P.B.P. testified that the most recent meltdown occurred when he thought he got an answer wrong. P.B.P. testified that he stuck his head in a toilet and then ran out of the school and hid behind a tree. (Tr. 9-10.)

P.B.P. testified that he plays sports and plays at recess at school with friends. P.B.P. testified that he has a best friend. (Tr. 6-7.) P.B.P. testified that he used to go to church where he would play games, but that he no longer goes. (Tr. 7-8.)

P.B.P. testified that he takes out the trash every day at home, but that he sometimes forgets and his mom reminds him. P.B.P. testified that he takes the trash to a dumpster that is next to his neighbor's house. (Tr. 8.)

B.   Plaintiff's Testimony

Plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff testified that P.B.P. was disabled on account of attention deficit hyperactivity disorder (ADHD), impulsive explosive disorder, and oppositional defiant disorder (ODD). (Tr. 3.)

Plaintiff testified that P.B.P. has experienced meltdowns since the second half of kindergarten, but that she does not get as many calls from the school as she used to because the school is now better able to handle them. Plaintiff testified that P.B.P.'s previous school frequently called and asked plaintiff to pick up P.B.P. from school. Plaintiff testified that she would get such a call at least once a week. (Tr. 13.) Plaintiff testified that at P.B.P.'s current school, she was called to pick him up from school only five to seven times during the recent school year. (Tr. 17.)

Plaintiff testified that other than the recent episode where P.B.P. ran from the school building, she was unaware of the school allowing P.B.P. to go outside to work through his anger. Plaintiff testified that during the recent episode, the police were

called to help locate P.B.P. Plaintiff testified that the teachers usually try to remove P.B.P. or the other children from the classroom during P.B.P.'s episodes because they do not want the other children to see his behavior. (Tr. 16.) Plaintiff testified that she does not believe that P.B.P. has had in-school suspensions imposed because of his behavior. (Tr. 17.)

Plaintiff testified that P.B.P. sees a counselor at school as well as another teacher who helps him with reading and speech. Plaintiff testified that P.B.P. currently does not have a teacher that stays with him throughout the day, as P.B.P. testified, although such an arrangement was made at P.B.P.'s previous school. (Tr. 16.)

Plaintiff testified that P.B.P. experiences a meltdown when things are not perfect, such as when he makes a small error or when he believes his work is not good enough. Plaintiff testified that playing board games with P.B.P. is difficult because he wants to start over if he is losing and will knock the pieces off of the board. (Tr. 17-18.)

Plaintiff testified that P.B.P. does well staying on task and wants to finish whatever project he is working on. (Tr. 20.) Plaintiff testified, however, that P.B.P. has difficulty moving from one task to another. Plaintiff also testified that P.B.P. has difficulty completing his chores at home because he feels that someone else should do them. Plaintiff testified that P.B.P.

accepts her redirection pretty well.  (Tr. 17-18.)

Plaintiff testified that P.B.P. has been diagnosed with ADHD but that she disagrees with the diagnosis.  Plaintiff testified that P.B.P.'s doctor finally ruled out ADHD and recently diagnosed P.B.P. with attention deficit disorder (ADD) for which he was prescribed new medication.  Plaintiff testified that P.B.P.'s medications now include Risperdal, Depakote, Metadate, and Zoloft.  Plaintiff testified that P.B.P. has recently gained significant weight but she does not know whether to attribute it to side effects from the medications.  (Tr. 20-21.)  Plaintiff testified that P.B.P. is able to take care of himself and his personal hygiene, although he wets the bed at night.  Plaintiff testified that the doctors are aware of this problem but have not addressed it.  (Tr. 25-26.)

Plaintiff testified that P.B.P. sees a psychiatrist as well as a school counselor, but that she has seen no real change since he began treatment.  Plaintiff testified that P.B.P. has an upcoming appointment to be tested for Asperger's Syndrome, but that P.B.P. had not yet been formally diagnosed.  (Tr. 18-19.)

Plaintiff testified that P.B.P. plays and interacts well with children his own age and shows no aggression toward them.  Plaintiff testified that P.B.P. can be mean when he loses control and that he once kicked and struck a trash can during one of his episodes.  Plaintiff testified that P.B.P. cannot be redirected

when he is in the middle of a meltdown.  (Tr. 19.)  Plaintiff testified that P.B.P.'s episodes are not as extreme at home because he knows plaintiff can spank him and because he does not have to look good for someone else.  Plaintiff testified that P.B.P. feels he has to be the best while at school.  (Tr. 20.)  Plaintiff testified that P.B.P. appears to be happy for the most part but does not really show much emotion.  (Tr. 26.)

### III.  Medical, School and Counselor Records

In an Evaluation Report dated March 14, 2005, the Center School District noted that P.B.P. was in the early childhood education program.  Areas of concern identified in the evaluation included P.B.P.'s speech and language, and screening resulted in a diagnosis of "sound system disorder."  Suggestions were made to help P.B.P. progress in the general curriculum, including reading to P.B.P., repeating sounds correctly, and playing rhyming games. It was also noted that plaintiff had reported that P.B.P. had temper tantrums when he does not get his way and that such tantrums last from ten to thirty minutes. (Tr. 217-21.)

On September 6, 2007, P.B.P. was admitted to the Research Psychiatric Center for evaluation following an anger outburst.  It was noted that P.B.P. was six years of age and that his school recommended that he undergo such evaluation on account of daily temper tantrums during which he yells, bangs his head, and vocalizes his wish that he were dead.  It was noted that P.B.P. had

to be restrained at school several times during the previous week. It was noted that P.B.P. had previously received therapeutic services but was never psychiatrically hospitalized nor had taken psychotropic medications. Mental status examination showed P.B.P. to be very distracted and markedly hyperkinetic with noted difficulty sitting still. P.B.P.'s mood was noted to be good and he was observed to be comfortable in the hospital setting. P.B.P. appeared to be of average intelligence but with impaired insight and judgment. P.B.P. was initially diagnosed with intermittent explosive disorder and ADHD, and was assigned a Global Assessment of Functioning (GAF) score of 43.[1] P.B.P. was placed on Ritalin[2] during his hospitalization. On September 10, 2007, it was noted that P.B.P. had not displayed explosive behavior and had positive interactions with his peers. P.B.P. was discharged home that date with instruction to follow up with a psychiatrist for medication management. (Tr. 211-14.)

P.B.P. was readmitted to the Research Psychiatric Center

---

[1]A GAF (Global Assessment of Functioning) score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

[2]Ritalin is used to control symptoms of ADHD. Medline Plus (last revised Jan. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682188.html>.

on September 18, 2007, after having had a severe episode of explosive behavior. P.B.P. responded well to medication and was discharged home on September 19, 2007, with instruction to follow up. (Tr. 215.)

P.B.P. visited Dr. Lee T. Weng, a psychiatrist, on September 26, 2007. It was noted that P.B.P. had problems in school and had been hospitalized for four days after which he was given a diagnosis of ADD. P.B.P.'s current medications were noted to be Ritalin and Risperdal.[3] Plaintiff reported that P.B.P. was doing okay but continued to be hyper. Dr. Weng noted that P.B.P. had low grades in first grade. Mental status examination showed P.B.P. to be hyper. Plaintiff was instructed to increase P.B.P.'s dosage of Ritalin and Risperdal. (Tr. 256.)

P.B.P. visited Dr. Weng on October 3, 2007, who noted P.B.P. to look well and report that he felt well. It was noted that P.B.P. was doing okay. P.B.P. was prescribed Ritalin and Risperdal and was instructed to return in three weeks. (Tr. 255.)

P.B.P. returned to Dr. Weng on October 24, 2007. It was noted that P.B.P. was upset because of poor spelling. No change was made in P.B.P.'s medication. (Tr. 255.)

P.B.P. returned to Dr. Weng on November 14, 2007. It was noted that plaintiff wanted to change P.B.P.'s medication from

_____

[3]Risperdal is used to treat the symptoms of schizophrenia and to treat episodes of mania in persons with bipolar disorder. Medline Plus (last revised June 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html>.

Ritalin to Adderall.[4]  Dr. Weng determined to add Adderall to P.B.P.'s medication, and instructed that P.B.P. continue on Ritalin and Risperdal.  (Tr. 255.)

P.B.P. was admitted to the Two Rivers Psychiatric Hospital on November 15, 2007, on account of anger and aggression. P.B.P. was placed on Risperdal and Adderall and was diagnosed with mood disorder and ADHD.  P.B.P. was discharged on November 19, 2007, with instruction as to continuing care for mood stabilization.  (Tr. 242-45.)

P.B.P. returned to Dr. Weng on January 2, 2008. Plaintiff reported to Dr. Weng that P.B.P. seemed to be better while taking Risperdal and Adderall.  (Tr. 255.)

P.B.P. returned to Dr. Weng on February 27, 2008.  It was noted that P.B.P. experienced increased rage and temper.  It was noted that P.B.P. had hit a teacher and was suspended.  Depakote[5] was prescribed.  No change was ordered in P.B.P.'s other medication.  (Tr. 255.)

From August 2007 to February 2008, P.B.P. engaged in dangerous or threatening behavior at Boone Elementary School on four reported occasions which resulted in out-of-school

_____

[4]Adderall is used to control symptoms of ADHD.  Medline Plus (last revised Aug. 1, 2010)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a601234.html>.

[5]Depakote is used to treat certain types of seizures and to treat mania in persons with bipolar disorder.  Medline Plus (last revised July 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a682412.html>.

suspensions. Such behavior included striking a teacher, trying to hit a teacher and school property with a chair, trying to bite school personnel, trying to break out a school window, and threatening to kill himself. (Tr. 167-68.)

On March 10, 2008, Lynne Boyer of Boone Elementary School completed a Teacher Questionnaire for disability determinations. (Tr. 111-18.) Ms. Boyer noted that she had known P.B.P. for three months when P.B.P. was in the first grade. Ms. Boyer was P.B.P.'s teacher in a self-contained classroom for reading, math and written expression, which met daily for four to five hours. It was noted that the student to teacher ratio in the room was 6:2. Ms. Boyer opined that P.B.P. had problems in the domain of Acquiring and Using Information, noting specifically that P.B.P. had obvious problems in the areas of comprehending and/or following oral instructions, understanding school and content vocabulary, understanding and participating in class discussions, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. Ms. Boyer also noted specifically that P.B.P. had serious problems in providing organized oral explanations and adequate descriptions, and very serious problems in reading and comprehending written material. In the domain of Attending and Completing Tasks, Ms. Boyer opined that P.B.P. had obvious problems refocusing to task when necessary, waiting to take turns, changing from one activity

to another without being disruptive, and completing work accurately without careless mistakes.  Ms. Boyer also noted specifically that P.B.P. had serious problems on a daily basis carrying out multi-step instructions.  In the domain of Interacting and Relating with Others, Ms. Boyer opined that P.B.P. had obvious problems seeking attention appropriately, and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversations; serious problems with respecting/obeying adults in authority, relating experiences and telling stories, and using language appropriate to the situation and listener; and very serious problems with expressing anger appropriately.  Ms. Boyer noted that behavior modification strategies had been implemented for P.B.P. which consisted of him going to a recovery room, safe spot or buddy room with a behavior plan that provided choices.  Ms. Boyer opined that P.B.P. had no problems in the domain of Moving About and Manipulating Objects.  With respect to the domain of Caring for Himself, Ms. Boyer opined that P.B.P. had obvious problems using good judgment regarding personal safety and dangerous circumstances; and serious problems being patient when necessary, identifying and appropriately asserting emotional needs, and knowing when to ask for help.  Ms. Boyer also specifically noted that P.B.P. had very serious problems handing frustration appropriately, responding appropriately to changes in own mood, and using appropriate coping skills to meet daily demands of the school

environment. Elaborating on P.B.P.'s relevant behavior in this domain, Ms. Boyer stated:

> He wants all his work to be perfect. If he doesn't get 100% on his papers, tests, etc., he will have a meltdown. He recently did not like the RIF book that was given to him, he had a meltdown. He wants everything to be perfect. He wants immediate help and doesn't like to wait.

(Tr. 116.)

Ms. Boyer stated that P.B.P. experiences depression when things are not perfect, observing: "When he has a meltdown, he will not respond to redirection. He will crawl on floor, try to get under furniture, slobber all over himself or furniture, cry very loud, sounds like a newborn infant." (Tr. 117.)

On March 26, 2008, Dr. Weng noted plaintiff to report that things were "still not right" and that the medications were not helping. There continued to be ongoing problems at school, and it was questioned whether P.B.P. had anxiety, Asperger's or autism. P.B.P. was instructed to continue with Adderall and Risperdal and to increase his dosage of Depakote. (Tr. 343.)

On March 27, 2008, P.B.P. underwent a psychological assessment for disability determinations. (Tr. 262-65.) Dr. Jamie C. Prestage noted P.B.P. to have articulation errors in his speech, but that his speech was generally intelligible. P.B.P. was compliant and cooperative during the examination. P.B.P. had an

age appropriate fund of personal and current information and was noted to be alert and well oriented. P.B.P.'s eye contact was noted to be brief and intermittent, and his affect was flat. It was noted that P.B.P. was talkative but spoke in more of a monologue rather that in reciprocal conversation. P.B.P.'s IQ was measured to be 90. P.B.P. reported that he no longer had suicidal thoughts, but that he had wanted to kill himself in the past whenever he was mad. P.B.P. reported that his brother and sister were aggressive toward him. Dr. Prestage noted P.B.P. to be sensitive and protective of his mother. Plaintiff reported that P.B.P. was able to care for his personal needs. Plaintiff reported P.B.P. to have begun exhibiting behavioral problems in school in December 2006, and that he had previously been hospitalized because of his losing control and his expressed desire to die or to kill someone else. Plaintiff reported that P.B.P. currently received counseling at school and was taking Risperdal, Depakote and amphetamine. Plaintiff reported P.B.P. to have very poor control of his emotions and of coping skills. Plaintiff reported P.B.P. to be explosive and destructive and that he becomes out of control over minor errors such as sounding out a word incorrectly. Dr. Prestage determined to complete the Asperger Syndrome Diagnostic Scale, the results of which placed P.B.P. in the likely range of probability for Asperger's Syndrome. Upon conclusion of the entire evaluation, Dr. Prestage concluded:

> [P.B.P.] presents a complex clinical picture.
> It is the current opinion of this examiner,
> based on observation and information provided
> by his mother, that he meets the DSM-IV
> diagnostic criteria for Asperger Syndrome. In
> addition, secondary to this diagnosis, it is
> the opinion of this examiner that he is
> exhibiting symptomatology consistent with
> anxiety and depression. It should be noted
> that he previously also has been given the
> diagnosis of Attention Deficit Hyperactivity
> Disorder, Combined Type.
>
> [P.B.P.] is a child that exhibits
> inappropriate social and emotional behavior.
> He is inflexible and has difficulty in
> processing and understanding some social
> interactions. [P.B.P.] tends to be over
> reactive and explosive. He appears to
> function intellectually in the average range
> of general intelligence.

(Tr. 265.)

Dr. Prestage diagnosed P.B.P. with Asperger's Syndrome, mood disorder NOS, anxiety disorder NOS, and ADHD. It was recommended that an appropriate educational treatment program be developed for P.B.P. Dr. Prestage opined that individual psychotherapy was a necessary outlet for P.B.P. (Tr. 262-65.)

In a Childhood Disability Evaluation Form completed April 28, 2008, Margaret Sullivan, a consultant with disability determinations, opined that P.B.P.'s Asperger's Syndrome, mood disorder and anxiety disorder resulted in less than marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with

Others.  Ms. Sullivan opined that P.B.P. had marked limitations in the domain of Caring for Yourself, and no limitations in the domain of Health and Physical Well-Being.  Ms. Sullivan expressed no opinion regarding the degree of P.B.P.'s limitations in the domain of Moving About and Manipulating Objects.  Ms. Sullivan concluded that P.B.P.'s impairment did not meet or equal a listed impairment. (Tr. 266-71.)

On May 21, 2008, Ms. Abby, a paraprofessional assigned to P.B.P. at his school, submitted a report wherein she described P.B.P. as an absolute perfectionist who worked best with someone by his side to confirm that he was correct with his schoolwork.  Ms. Abby described P.B.P. as becoming extremely stressed when he does not immediately know the correct answer, and then having a meltdown.  Ms. Abby reported that reading was especially stressful for P.B.P. because he wants to read at a higher level but is unable to do so.  Ms. Abby described P.B.P. as very competitive and reported that he becomes stressed and has a meltdown when he is not winning.  Ms. Abby described P.B.P. as playing "among" the other children as opposed to with them, and that he has charged at teachers and other children when he has a meltdown, sometimes armed with a chair.  Ms. Abby reported that on good days, P.B.P. likes to help other children and feels good about himself.  Ms. Abby opined that the main cause of P.B.P.'s meltdowns is extreme tiredness which results in defiance, meanness and lack of control.  Ms. Abby

reported having difficulty meeting P.B.P.'s special needs without rewarding negative behavior. Ms. Abby also described P.B.P. as obsessive and reported that P.B.P.'s obsessions prevent him from participating in or completing projects until and unless what he is obsessing over comes to fruition. Ms. Abby reported that P.B.P. has a difficult time accepting responsibility and often blames other persons or circumstances for his behavior. Ms. Abby reported that positive reinforcement and incentives work well in trying to control P.B.P.'s behavior, but that the possibility of losing a reward or privilege often sends P.B.P. "over the edge." Ms. Abby reported P.B.P. to be very perceptive and bright and to become bored and restless easily if he is not kept busy and given one-on-one attention. Ms. Abby reported that P.B.P. does well in "Specials" with hands-on activities, but that he does not like being in a regular classroom setting. Routine was noted to be important for P.B.P. (Tr. 132-35.)

P.B.P.'s first grade report card for the 2007-08 school year showed P.B.P. to be performing below grade level in reading. P.B.P. obtained C grades in reading, writing, science, and social studies; and A's and B's in math. (Tr. 169.) It was reported that P.B.P. performed below expectations in the area of personal social development, and specifically with demonstrating self help skills, following school and classroom expectations, demonstrating effective verbal skills, respecting peers and adults, and assuming

responsibility for own actions. It was reported that P.B.P. met or exceeded expectations in the areas of art, music and physical education. (Tr. 170.)

In a Behavior Intervention Log completed by Boone Elementary School's Behavior Specialist, Christine Jones, Ms. Jones documented forty-four separate occasions between August 2007 and May 2008 when P.B.P. needed behavioral intervention, with such interventions having a duration from fifteen minutes to all day events. Notations were made of P.B.P. shutting down in class, crying, crawling on the floor, trying to hurt himself, expressing a desire to die and/or kill himself, walking out of class, and disrupting class. Other notations were made of P.B.P. receiving counseling on positive behavior, reviewing coping strategies, and displaying good attitudes. Ms. Jones noted that P.B.P. was very smart, enjoyed reading grade-level books, and was a very good artist. Ms. Jones noted that P.B.P. used these skills as coping mechanisms to calm down after experiencing an outburst. (Tr. 125-30.)

P.B.P. visited Comprehensive Psychiatric Associates on June 25, 2008, for purposes of clarifying his diagnosis and to evaluate his current medications. Plaintiff reported P.B.P.'s problems to have started the second half of his kindergarten year, and that P.B.P. was a perfectionist, anxious, worried, and had a low frustration tolerance. Plaintiff reported P.B.P. to be angry

and that he yells, sometimes throws things, hits, and kicks. Plaintiff reported such anger outbursts to happen nearly every day and that they were worse at school. Plaintiff reported that they were not happy with Dr. Weng and that P.B.P.'s medications were not working. Dr. P. McCoy noted P.B.P.'s medications to be Depakote, Adderall and Risperdal. P.B.P. reported that his thoughts were like race cars racing in his head. Dr. McCoy noted that P.B.P.'s speech was difficult to understand. Mental status examination showed P.B.P. to be pleasant and cooperative, but with poor eye contact and increased psychomotor activity. P.B.P. denied any suicidal or homicidal ideations. Dr. McCoy noted P.B.P. to fidget. P.B.P. could not identify the names of his friends. Dr. McCoy ordered laboratory testing for P.B.P. and advised plaintiff that she may consider tapering P.B.P. off of his current medications so that she could reevaluate P.B.P.'s baseline condition. In the meanwhile, Dr. McCoy determined to continue P.B.P. on his current medications. Dr. McCoy assigned P.B.P. a GAF score of 50[6] and instructed him to return in two to three weeks. (Tr. 291-92.)

P.B.P. returned to Dr. McCoy on July 17, 2008, who noted P.B.P. to be doing okay. Mental status examination showed P.B.P. to be cooperative and calm. P.B.P.'s mood was noted to be happy and his affect was congruent. Plaintiff was instructed to increase P.B.P.'s dosage of Depakote and to continue with current dosages of

---

[6]See n.1, supra.

Risperdal and Adderall. Additional laboratory testing was ordered, and P.B.P. was instructed to return for follow up in three to four weeks. (Tr. 290.)

On August 14, 2008, P.B.P. did not keep a scheduled appointment with Dr. McCoy. (Tr. 289.)

In a Disciplinary Report dated September 10, 2008, it was reported that P.B.P. threw a tantrum in the classroom by turning over desks and chairs and by wailing, crying, yelling, and flailing his arms. P.B.P.'s teacher, Ms. Harvey, had to remove the other children from the classroom. P.B.P. perched himself on top of the teacher's podium and was caught by Ms. Harvey as he fell backwards whereupon he then started to crawl under the rug. P.B.P. then ran to the bathroom where he barricaded himself for thirty minutes. P.B.P.'s mother was called to come to school and take him home. It was noted that P.B.P. had also thrown a fit earlier that day in speech therapy during which he rolled on and licked the floor, and kept himself under the teacher's desk until coaxed out by the process coordinator. (Tr. 222, 224.)

In a Disciplinary Report dated September 18, 2008, it was reported that P.B.P. would not work in the classroom and became increasingly noisy and disruptive. When the children were allowed to go outside upon completion of three rows of math, P.B.P. ran into the hall, threw himself on the floor, and kicked and screamed and wailed. P.B.P. begged for a chance to do his math and, upon

doing so, answered all of the questions incorrectly upon which he threw another fit and ran away to the office. P.B.P.'s grandfather was called to come pick him up from school. (Tr. 225-27.)

P.B.P. visited Dr. Sultana Jahan, a psychiatrist, on September 24, 2008, for a second opinion as to diagnosis and treatment. Plaintiff reported P.B.P.'s history of frustration, meltdowns and trouble at school. Plaintiff reported P.B.P. to be able to concentrate, not to be hyperactive or forgetful, and usually in a good mood. Plaintiff reported P.B.P. not to be argumentative and to not get angry easily, but that he blames others for his behavior. Dr. Jahan noted P.B.P. to be taking amphetamine and Risperidone.[7] Mental status examination was generally unremarkable, except P.B.P.'s insight was noted to be poor. Dr. Jahan noted P.B.P.'s diagnoses to be ADHD by history, intermittent explosive disorder by history, mood disorder by history, and enuresis. Dr. Jahan assigned a GAF score of 56.[8] Dr. Jahan requested records from P.B.P.'s school and recommended that P.B.P. undergo assessment at an ADHD clinic. P.B.P. was instructed to return in four to six weeks for further discussion of evaluation, diagnosis and treatment recommendations. (Tr. 333-37.)

---

[7]Risperidone is marketed under the brand name Risperdal. Medline Plus (last revised June 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html>.

[8]A GAF score of 51 to 60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).

On October 21, 2008, the Salisbury R-IV School District put an IEP in place for P.B.P. based upon the following information: In January 2008, P.B.P. was administered the Wechsler Intelligence Scale for Children--4th Edition wherein he obtained a verbal comprehension score of 96, a perceptual reasoning score of 94, a working memory score of 70, and a processing speed score of 83. P.B.P.'s full scale IQ was measured to be 87 which placed him in the low average range. On the Test of Early Mathematics Ability administered in January 2008, P.B.P. placed in the fourth percentile. On the Test of Early Reading Ability, P.B.P.'s overall reading quotient placed him in the third percentile. Educational deficits were identified in the areas of basic reading skills, reading comprehension, listening comprehension, and other observable behaviors which included being disruptive in class, defiance or noncompliance, withdrawal, seldom expression of feelings or emotions, impulsivity, erratic behavior, unusual nervousness, and frequent crying. The results of Teacher Rating Scales completed in the first grade raised significant concerns in the areas of aggression, anxiety, depression, atypicality, and withdrawal. It was noted that in first grade, P.B.P. spent much of several days with the recovery room specialist. P.B.P. was re-evaluated in February 2008 due to significant behavior concerns, and specifically, extreme anger, threats to hurt himself, attempts to hit things and people, crawling on the floor, crying loudly,

yelling, and trying to bite individuals who were helping him. It was noted that in November 2007, Dr. Weng diagnosed P.B.P. with mood disorder and ADHD, and that Risperdal and Adderall were prescribed for P.B.P. Upon review of this information, the October 2008 IEP group put in place an IEP plan which directed that P.B.P. would spend at least eighty percent of instruction time within a regular classroom. It was determined that full participation in the regular classroom would increase student frustration. (Tr. 181-91, 197-206.)

On November 12, 2008, P.B.P. underwent a psychological assessment for diagnosis and treatment recommendations. Dr. Ellen A. Horwitz noted P.B.P. to have previously been diagnosed with ADHD and intermittent explosive disorder, and that his current medications of Risperdal, Adderall and Depakote did not appear to be effective. Dr. Horwitz noted P.B.P.'s past medical and behavioral history. Plaintiff reported that the medications do not help P.B.P.'s condition and that he continues to have meltdowns whereupon he gets a blank look on his face, rolls on and licks the floor, and talks about killing himself. Plaintiff reported that she is able to ward off most meltdowns at home by being firm with P.B.P. Plaintiff reported that, other than his meltdowns, P.B.P. displayed little emotion. Dr. Horwitz noted P.B.P. to have some sensory type symptoms, but to have no auditory symptoms such as being disturbed by loud noises. P.B.P. had normal pain tolerance.

Plaintiff reported that some caregivers have indicated possible Asperger's disorder, but that she did not know exactly what the condition was. It was noted that P.B.P. seemed to be doing okay in scouts and that he participated in some church activities. Plaintiff described P.B.P. as a worrier, cautious, sensitive to feedback and criticism, and somewhat of a perfectionist. Plaintiff reported that P.B.P. had difficulty following multi-step directions but, in her opinion, did not exhibit symptoms of ADHD. Plaintiff expressed her opinion that P.B.P. had some control over his behavior and engages in his outbursts when he thinks he can get away with such behavior. (Tr. 297-303.)

Dr. Horwitz conducted a series of tests and evaluations throughout the course of her examination. On the Achenbach Child Behavior Checklist, Dr. Horwitz noted P.B.P. to be borderline to elevated on the externalizing problems scale, clinically elevated on the internalizing problems scale, and in the borderline range on the total competence scale. The Disruptive Behavior Disorders Ratings Scale showed P.B.P. to display forty-five behaviors which included symptoms of ADHD, oppositional defiant disorder and con-duct disorder, with P.B.P. noted to have obtained high scores with problems including interrupting, talking excessively, refusing to talk, self conscious or easily embarrassed, and cries easily. Dr. Horwitz noted the teacher rating scales to show P.B.P. to exhibit the following problems at a higher level: being a perfectionist,

having temper outbursts/explosive, avoiding or reluctant to engage in tasks that require sustained mental effort, emotional, having difficulty waiting his turn, overfocused on details, talking excessively, demands must be met immediately, easily frustrated, answers questions before they have been completed, and having quick and drastic mood changes. Dr. Horwitz noted that the Achenbach scores obtained form P.B.P.'s speech therapy teacher placed P.B.P. at the level of clinically elevated in the internalizing and externalizing problems scales. The teacher specifically reported that P.B.P. sometimes chooses not to cooperate during therapy sessions and throws a fit during which time he is very disrespectful of the teacher's property by kicking chairs and throwing things from her desk onto the floor. Dr. Horwitz noted the therapy teacher's rating scales demonstrated P.B.P. to have the following problems at a higher level: argues, defiant, cries a lot, destroys property, disobedient, breaks school rules, disturbs other pupils, disrupts class discipline, feels hurt when criticized, feels he has to be perfect, sudden changes in mood, and impulsive actions. (Tr. 304-05.)

When Dr. Horwitz's examiner took P.B.P. for testing, P.B.P. began the testing session performing the tasks requested. Upon having difficulty with a task, he stopped, scribbled, and put his head on the table and cried. P.B.P. went to the door and tried to leave the examination room. The examiner reported that she had

to hold on to P.B.P. to keep him from running off, after which P.B.P. pulled free, sat on the floor facing the corner, and cried. After the examiner successfully returned P.B.P. to the examination, P.B.P. performed the tasks as requested. P.B.P. then grabbed the examiner's clipboard, tried to rip off the pages, and then began stabbing it with the pen. The examiner described P.B.P. as becoming violent in that he grabbed onto the table, lied down on it, and began kicking and yelling; began kicking the filing cabinets and hitting the examiner; pounded on the computer keyboard; and yelled that he wanted to kill the examiner and kill himself. Upon being called, Dr. Horwitz and plaintiff returned to the room whereupon plaintiff was able to calm P.B.P. (Tr. 305-06.)

Upon conclusion of the evaluation, Dr. Horwitz reported P.B.P. to have a "complex presentation of symptoms." Dr. Horwitz noted P.B.P.'s diagnostic history to include diagnoses of intermittent explosive disorder, ADHD and mood disorder. Dr. Horwitz questioned whether P.B.P. had oppositional defiant disorder, anxiety disorder and autism spectrum disorder, as well as language disorder, motor coordination disorder, specific learning disabilities, and seizure disorder. Dr. Horwitz determined P.B.P.'s GAF score to be 48.[9] Dr. Horwitz recommended that P.B.P. follow up with Dr. Jahan, undergo an EEG, and engage in outpatient counseling including family counseling. Dr. Horwitz also

_____

[9] See n.1, supra.

recommended that P.B.P.'s school develop a behavioral plan for P.B.P., with such plan to have input from an occupational therapist. Further evaluation for autism spectrum disorder was considered. (Tr. 297-309.)

In a Disciplinary Referral dated January 8, 2009, P.B.P. was noted to be engaged in out-of-control, defiant behavior which was destructive to school property. It was noted that the counselor was consulted regarding the behavior and that a telephone call was placed to P.B.P.'s parent and to the police. A three-day out-of-school suspension was imposed. (Tr. 228.)

P.B.P. visited Dr. Jahan on January 23, 2009. Plaintiff reported P.B.P. to become easily distracted and that it is hard for him to focus. Plaintiff reported P.B.P. to have fits when something does not go right. Plaintiff reported P.B.P. to worry about anything. Mental status examination showed P.B.P. to be happy, cooperative, alert, and euthymic. Dr. Jahan determined to discontinue Adderall for two weeks to determine whether P.B.P. had ADHD symptoms. P.B.P. was instructed to continue with Risperdal and Depakote. (Tr. 316.)

P.B.P. returned to Dr. Horwitz on January 23, 2009. It was noted that Dr. Jahan had determined to gradually discontinue Adderall from P.B.P.'s medication regimen. Plaintiff reported P.B.P. to be doing fairly well at school but that he was recently suspended. Plaintiff questioned whether P.B.P. understood how

frustrated he becomes and how extreme his behavior can be. Dr. Horwitz noted P.B.P. to have an EEG scheduled February 10, 2009. Plaintiff reported P.B.P. to have begun outpatient counseling. Dr. Horwitz noted P.B.P. to be cooperative but difficult to engage. P.B.P. seemed restless and distractible. There were no changes from Dr. Horwitz's previous impressions, although she questioned the presence of bipolar disorder. No follow up appointment was scheduled. (Tr. 294-96.)

P.B.P. returned to Dr. Jahan on February 8, 2009. Mental status examination was unremarkable. Plaintiff reported P.B.P. to be doing well at school. Dr. Jahan determined to try Zoloft[10] for one week. P.B.P. was instructed to increase his dosage of Depakote and to continue with Risperdal as prescribed. (Tr. 315.)

The results of an EEG administered February 10, 2009, were normal. (Tr. 311.)

P.B.P. returned to Dr. Jahan on March 2, 2009. Plaintiff reported that P.B.P. had recently been sent home from school because of throwing a fit. Plaintiff reported P.B.P. to generally be happy and to get along with his teachers and peers. P.B.P.'s current medications were noted to be Risperdal and Depakote. Dr. Jahan instructed P.B.P. to continue with his current medications as prescribed. (Tr. 314.)

---

[10]Zoloft is used to treat depression, obsessive compulsive disorder, panic attacks, and social anxiety disorder. Medline Plus (last revised Aug. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html>.

In a Disciplinary Referral dated March 30, 2009, P.B.P. was reported to have had another crying meltdown whereupon he began running, yelling, and pushing chairs and desks. P.B.P.'s grandfather was called to come pick him up from school, after which P.B.P. ran into the bathroom and came out with the top of his head wet after having stuck his head in the toilet. P.B.P. then slobbered and spit and rubbed his head on the reading table after which he ran out the back door of the classroom and down the street. Ms. Harvey followed P.B.P. in her car. The police were called and found P.B.P. in a ditch in a field. A two-and-a-half-day out-of-school suspension was imposed and plaintiff was cautioned that any more disruptions of the classroom would likely result in an out-of-school suspension for the remainder of the school year. (Tr. 229-31.)

On April 17, 2009, the Salisbury R-IV School District amended P.B.P.'s IEP and determined for P.B.P. to spend 545 minutes outside the regular classroom each week, which represented an increase of 245 minutes per week. It was noted that P.B.P.'s increased frustration within the classroom warranted the increase. (Tr. 175-77.)

P.B.P. returned to Dr. Jahan on April 24, 2009. Plaintiff reported P.B.P. to be doing okay with his behavior but that he continued to have problems with attention and concentration. No hyperactivity was noted. Plaintiff requested

that a new medication be tried. Dr. Jahan noted P.B.P.'s current medications to be Risperdal, Depakote and Zoloft. P.B.P. was instructed to continue with his current medications and to try Metadate CD.[11] (Tr. 313.)

On April 28, 2009, P.B.P.'s second grade teacher, Ms. Harvey, completed a Teacher Questionnaire for disability determinations. In the questionnaire, Ms. Harvey reported that she had been P.B.P.'s teacher but that P.B.P.'s time spent in her classroom decreased during the year as he received additional assistance outside the classroom for all language arts and math. Ms. Harvey reported that P.B.P. was in her classroom for socialization, science and social studies. Ms. Harvey reported that in the areas of math, reading and written language, P.B.P. was performing below grade level. In the domain of Acquiring and Using Information, Ms. Harvey reported that P.B.P. had slight or no problem in the areas of comprehending oral instructions, understanding school and content vocabulary, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, recalling and applying previously learned material, and applying problem-solving skills in class discussions. Ms. Harvey reported that P.B.P. had serious or very serious problems in the areas of reading and comprehending

---

[11]Metadate is another brand name for Ritalin. <u>See</u> <u>Medline Plus</u> (last revised Jan. 1, 2011)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html</u>>.

written material, comprehending and doing math problems, expressing ideas in written form, and learning new material.  In the domain of Attending and Completing Tasks, Ms. Harvey reported P.B.P.'s only problem was in the area of completing work, stating specifically that P.B.P. did "not make 'careless' mistakes.  He is not willing to 'make' a mistake.  He will erase and keep doing the problem or he will refuse to do the work.  He will cause major disruption to the class before he will write down a wrong answer."  In the domain of Interacting and Relating with Others, Ms. Harvey reported that P.B.P. had very serious problems in the areas of seeking attention appropriately and expressing anger appropriately, but had slight or no problems with playing cooperatively, making and keeping friends, following rules, and taking turns in a conversation.  Ms. Harvey stated that P.B.P. received a lot of help and that behavior modification strategies had been implemented for P.B.P., such as a quiet room, removal from the classroom, and suspension.  Ms. Harvey reported that P.B.P. had no problems in the domain of Moving About and Manipulating Objects.  In the domain of Caring for Oneself, Ms. Harvey reported that P.B.P. had serious to very serious problems in the areas of handling frustration appropriately, identifying and appropriately asserting emotional needs, and responding appropriately to changes in his own mood.  Ms. Harvey reported that P.B.P. had slight or no problems in the areas of personal hygiene, caring for physical needs, using good judgment regarding personal

safety and dangerous circumstances, and knowing when to ask for help. Ms. Harvey stated specifically that P.B.P.'s behavior was what concerned her the most, and that he would promise to "be good" when consequences for wrong behavior were imposed. Ms. Harvey reported that responses to P.B.P.'s behavior changed when his needs changed, and that P.B.P. saw several teachers who helped him academically but also provided him a physical change in his environment. (Tr. 156-63.)

On P.B.P.'s second grade report card, Ms. Harvey noted in the second quarter that P.B.P. was making good progress. For the third quarter, Ms. Harvey noted that P.B.P. becomes frustrated when he makes mistakes on schoolwork and that he sometimes starts his meltdown because he makes a mistake or does not want to do the lesson. (Tr. 164.) P.B.P. received A's and B's in the subjects of reading and spelling, and A's and C's in mathematics. In the areas of work habits and social growth, P.B.P. received grades of Satisfactory. (Tr. 165.) P.B.P.'s midterm progress report for the fourth quarter showed P.B.P. to have a C in reading and a B in spelling, with no recorted grade in math. (Tr. 166.)

In a letter dated May 15, 2009, MSW, LCSW Cynthia E. Baker wrote that she had been seeing P.B.P. for counseling every two weeks since January 13, 2009, and that:

> [P.B.P.] present[ed] with learning delays . . . and Oppositional Defiant Disorder. He seems to have difficulty processing information,

> social anxiety, have difficulty processing and
> appropriately expressing feelings.  Especially
> feelings relating to anger.

(Tr. 339.)

Ms. Baker reported that she would like to see P.B.P. every week for counseling but that the long geographical distance to travel makes it too difficult of a drive each week.  (Tr. 339.)

## IV.  The ALJ's Decision

The ALJ found P.B.P. to be a school-aged child and not to have ever engaged in substantial gainful activity.  The ALJ found P.B.P.'s combined impairments of ADHD, mood disorder and intermittent explosive disorder to be severe, but not to meet or medically equal the severity of any impairment in the listings of impairments.  The ALJ also found P.B.P.'s impairments or combination of impairments not to functionally equal the listings. The ALJ thus determined P.B.P. not to have been disabled at any time since the filing of the application, that is, October 3, 2007. (Tr. 17-28.)

## V.  Discussion

A claimant under the age of eighteen is considered disabled and eligible for SSI under the Social Security Act if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 1382c(a)(3)(C)(i).

        The Commissioner is required to undergo a three-step
sequential evaluation process when determining whether a child is
entitled to SSI benefits.  First, the Commissioner must determine
whether the child is engaged in substantial gainful activity.  If
not, the Commissioner must then determine whether the child's
impairment, or combination of impairments, is severe.  Finally, if
the child's impairment(s) is severe, the Commissioner must
determine whether such impairment(s) meets, medically equals or
functionally equals the severity of an impairment listed in
Appendix 1 of Subpart P of Part 404 of the Regulations.  20 C.F.R.
§ 416.924(a); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647
(8th Cir. 2004).  If the impairment(s) meets or medically equals a
Listing, the child is disabled.  Garrett, 366 F.3d at 647.  If a
child's impairment does not meet or medically equal a listed
impairment, the Commissioner will assess all functional limitations
caused by the child's impairment to determine whether the
impairment functionally equals the listings.  20 C.F.R. § 416.926a.
To functionally equal a listed impairment, the child's condition
must result in an "extreme" limitation of functioning in one broad
area of functioning, or "marked" limitations of functioning in two
broad areas of functioning.  20 C.F.R. § 416.926a(a).  If this
analysis shows the child not to have an impairment which is
functionally equal in severity to a listed impairment, the ALJ must

- 33 -

find the child not disabled.  <u>Oberts o/b/o Oberts v. Halter</u>, 134 F. Supp. 2d 1074, 1082 (E.D. Mo. 2001).

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); <u>Young v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995) (citing <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998).  In evaluating the substantiality of the evidence, the Court must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision.  <u>Id.</u>  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome.  <u>Id.</u>

In this cause, plaintiff claims that the ALJ erred in failing to find P.B.P.'s impairments not to meet or medically equal a listed impairment under § 112.00 of the listings, inasmuch as P.B.P.'s mental condition results in a marked impairment in social functioning and in personal functioning, and thus satisfies the criteria to meet a listing.  Plaintiff also claims that the ALJ erred in his determination that P.B.P.'s impairments do not functionally equal a listed impairment inasmuch P.B.P. experienced marked to extreme limitations in the domain of Interacting and

Relating with Others.

A.    Meet or Medically Equal a Listed Impairment

        For a claimant to show that his impairment matches a
listing, the impairment must meet all of the specified medical
criteria.   Marciniak v. Shalala, 49 F.3d 1350, 1353 (8th Cir.
1995).   In order for an impairment to medically equal a listing,
there must be medical findings equal in severity to all of the
criteria for the one most similar listed impairment.   Id.

        In his written decision, the ALJ noted that plaintiff did
not identify in her argument any listing which she believed
P.B.P.'s impairments met or medically equaled.    (Tr.  42.)
Nevertheless, the ALJ examined P.B.P.'s impairments under § 112.08
for intermittent explosive disorder, § 112.04 for mood disorder
(depression), § 112.06 for anxiety disorder, and § 112.11 for ADHD.
For each of these listings, a claimant is found to have the listed
impairment "when the criteria of both paragraphs A and B of the
listed impairment are satisfied."   20 C.F.R. Pt. 404, Subpt. P,
App. 1, § 112.00(A).   Although the ALJ made no determination as to
whether P.B.P.'s impairments satisfied the "A" criteria of any of
the identified listings, he found that they failed to satisfy the
"B" criteria.   Plaintiff argues here that the ALJ erred in this
determination inasmuch as P.B.P.'s impairments indeed satisfy the
"B" criteria.[12]

_____

        [12]For  purposes  of  this  discussion  only,  the  undersigned
assumes, for the sake of argument, that the ALJ determined P.B.P.'s

To satisfy the "B" criteria for any of the identified listings, plaintiff was required to show that P.B.P.'s impairments result in at least two of following:

1) a marked impairment of age appropriate cognitive/ communicative functions;

2) a marked impairment of age appropriate social functioning;

3) a marked impairment of age appropriate personal functioning; or

4) marked difficulties in maintaining concentration, persistence or pace.

See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 112.04, 112.06, 112.08, 112.11 (referring to criteria set out in § 112.02.)

The ALJ determined P.B.P. not to have marked impairments in the domains of cognitive/communicative functions; social functioning; or maintaining concentration, persistence or pace. The ALJ made no findings regarding P.B.P.'s limitations in the area of personal functioning. (Tr. 42-43.) Plaintiff claims that P.B.P.'s impairments result in a marked impairment in social functioning and in personal functioning, and that the ALJ's determination otherwise is not supported by substantial evidence.

1. *ALJ's Opinion Writing Technique*

As an initial matter, the undersigned notes that the ALJ did not engage in any separate analysis in determining whether

_____

impairments to satisfy the "A" criteria of the relevant listings.

P.B.P.'s impairments met or medically equaled a listed impairment. (See Tr. 42-43.) Instead, the ALJ analyzed whether P.B.P.'s impairments *functionally* equaled a listed impairment, and stated that such findings were likewise determinative of the question as to *medical* equivalence. (Tr. 43.) Plaintiff does not challenge the ALJ's failure to make separate findings on these two questions. In Nighswonger v. Apfel, No. C98-4110, 2000 WL 34032674, at *1 n.1 (N.D. Iowa Feb. 9, 2000), the district court determined an ALJ's similar analytic structure to constitute nothing more than harmless error.

In Garrett, the Eighth Circuit was faced with a similar circumstance and noted that the "B" criteria for determining medical equivalence under listing 112.00 had analogous counterparts in the domains to be considered when determining functional equivalence under 20 C.F.R. § 916.926a. Indeed, as relevant to the instant cause, the Eighth Circuit stated that the "social functioning" element of the medical equivalence analysis was analogous to the "Interacting and Relating with Others" domain of functional equivalence, and that the "personal functioning" element of the medical equivalence analysis was analogous to the "Caring for Oneself" domain of functional equivalence. As such, the Eighth Circuit determined that, in the circumstances of that case, the same analysis may apply to each of those analogous elements/domains. Garrett, 366 F.3d at 651.

In the instant cause, for purposes of reviewing the ALJ's decision here, the undersigned determines to consider the ALJ's analysis as set out in his determination of functional equivalence to be applicable to his determination of the "B" criteria for medical equivalence to the extent such analysis encompasses those analogous provisions. See id.

2. *Personal Functioning*

As noted above, in that portion of his decision addressing the "B" criteria for medical equivalence, the ALJ made no finding regarding whether P.B.P.'s impairments resulted in a marked impairment in the area of personal functioning. However, in his analysis of functional equivalence, the ALJ found P.B.P. to suffer marked limitations in the domain of Caring for Oneself. (Tr. 45.) Inasmuch as the functional equivalence domain of Caring for Oneself is analogous to the medical equivalence element of personal functioning, the ALJ's finding that P.B.P. has marked limitations in this domain constitutes a finding that P.B.P.'s impairments result in a marked impairment in the area of personal functioning. Garrett, 366 F.3d at 651.

3. *Social Functioning*

In that portion of his decision addressing the "B" criteria for medical equivalence, the ALJ found P.B.P.'s impairments not to result in a marked impairment in the area of social functioning. Plaintiff contends that this determination is

not supported by substantial evidence on the record as a whole, and indeed that substantial evidence shows P.B.P. to suffer at least marked limitations in said area.

Although the ALJ determined P.B.P.'s impairments not to result in a marked impairment in social functioning, the ALJ provided no detailed analysis in the medical equivalence portion of his decision underlying this determination. However, in his determination of functional equivalence, the ALJ did engage in analysis and provided reasons for finding P.B.P.'s limitations in the analogous domain of Interacting and Relating with Others to be less than marked. (Tr. 45.) For purposes of this discussion, therefore, the undersigned determines this analysis to apply to the ALJ's decision regarding the "B" criteria element of social functioning. Garrett, 366 F.3d at 651. Such analysis is addressed infra at Section V.B.

B.    Functionally Equal a Listed Impairment

When a child's severe impairments are determined not to meet or medically equal a listing, the Commissioner is required to determine whether and to what extent the child's impairments affect broad areas of functioning as defined by the Regulations, and thus whether such impairments functionally equal a listing. To functionally equal the listings, the impairment must be of listing-level severity, i.e., it must result in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain.

20 C.F.R. § 416.926a(a). The domains are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains used by the Commissioner in making such a determination are: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Oneself; and 6) Health and Physical Well-Being. Id. As such, to be determined disabled, a child-claimant must have an extreme limitation in one domain or a marked limitation in two domains. 20 C.F.R. § 416.926a(a).

In determining functional equivalence, a child-claimant has a "marked" limitation in a domain when his

> impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities. [His] day-to-day functioning may be seriously limited when [his] impairment(s) limits only one activity or when the interactive and cumulative effects of [his] impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

20 C.F.R. § 416.926a(e)(2)(i).

A child will be found to have an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). In determining whether a child-claimant's functioning may be marked or extreme, the Commissioner is to review

all the evidence of record and "compare [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1); see also 20 C.F.R. § 416.926a(b) (in determining child-claimant's functioning, Commissioner looks "at how appropriately, effectively and independently [the child] perform[s] [his] activities compared to the performance of other children [the child's] age who do not have impairments."); 20 C.F.R. § 416.924a(b)(5). For children who have spent time in structured or supportive settings, such as special classrooms or residential facilities, the Commissioner is to consider whether and to what extent such structured setting affects the child's functional limitations and how the child would function outside of such setting. 20 C.F.R. § 416.924a(b)(5)(iv).

For the domain of Interacting and Relating with Others, the Commissioner is to consider how well the child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). The Regulations provide that school-age children should be able to

> develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of

> all ages, to share ideas, tell stories, and to
> speak in a manner that both familiar and
> unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv).

Examples of limited functioning in this domain are that the child

has no close friends or has friends that are all older or younger

than the child; avoids or withdraws from people the child knows, or

is overly anxious or fearful of meeting new people or trying new

experiences; has difficulty playing games or sports with rules; has

difficulty communicating with others, _e.g._, in using verbal and

nonverbal skills for self-expression, carrying on a conversation,

or in asking for assistance; and has difficulty speaking

intelligibly.  20 C.F.R. § 416.926a(i)(3)(ii)-(vi).

Inasmuch as the ALJ's decision that P.B.P. had less than

marked limitations in the domain of Interacting and Relating with

Others resulted in a decision that P.B.P.'s impairments did not

result in a marked impairment in the area of social functioning

when considering medical equivalence, what constitutes a marked

impairment in determining medical equivalence must likewise be

considered.

In determining medical equivalence, a child-claimant has

a "marked" limitation in a domain when

> several activities or functions are impaired,
> or even when only one is impaired, as long as
> the degree of limitation is such as to
> interfere seriously with the ability to

> function (based upon age-appropriate
> expectations) independently, appropriately,
> effectively, and on a sustained basis.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C);

In the area of social functioning, the Commissioner must consider the child's capacity to form and maintain relationships with parents, other adults, and peers.

> Social functioning includes the ability to get
> along with others (e.g., family members,
> neighborhood friends, classmates, teachers).
> Impaired social functioning may be caused by
> inappropriate externalized actions (e.g.,
> running away, physical aggression—but not
> self-injurious actions, which are evaluated in
> the personal area of functioning), or
> inappropriate internalized actions (e.g.,
> social isolation, avoidance of interpersonal
> activities, mutism). Its severity must be
> documented in terms of intensity, frequency,
> and duration, and shown to be beyond what
> might be reasonably expected for age.
> Strength in social functioning may be
> documented by such things as the child's
> ability to respond to and initiate social
> interaction with others, to sustain
> relationships, and to participate in group
> activities. Cooperative behaviors,
> consideration for others, awareness of others'
> feelings, and social maturity, appropriate to
> a child's age, also need to be considered.
> Social functioning in play and school may
> involve interactions with adults, including
> responding appropriately to persons in
> authority (e.g., teachers, coaches) or
> cooperative behaviors involving other
> children.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(C)(2)(b) (social function in preschool children), § 112.00(C)(3) (measures of function for primary school children similar to those for preschool children).

In this cause, the ALJ determined P.B.P. to have less than marked limitations in the functional equivalence domain of Interacting and Relating with Others. In reaching this conclusion, the ALJ found that P.B.P.'s

> current teacher rated him as having no problem or a slight problem in 10 of 13 areas of this domain. In the two areas where she rated him as having a very serious problems [sic] she indicated that the claimant problems [sic] occur on a monthly basis. There is not a problem with most of the areas of this domain. In the two areas where he has a very serious problem they are only occurring on a monthly basis. At the hearing the claimant displayed no unusual behaviors. He answered questions appropriately. The claimant's teacher also reported that his speech is quite intelligible. The State Agency psychologist rated the claimant as having a less than marked impairment of this domain. His report card does not show any "Needs Improvement" or "Unsatisfactory" grades in Social Growth. The testimony established that he gets along with other children. The claimant has problems in this domain but they are not marked or severe.

(Tr. 45.) (Citations to the record omitted.)

A review of the ALJ's decision shows this determination not to be supported by substantial evidence on the record as a whole.

In determining P.B.P. not to suffer marked limitations in the domain of Interacting and Relating with Others, the ALJ reviewed only checklist-type evidence in the record and did not consider the extensive narrative and detailed educational and

psychological evaluations relating to P.B.P.'s relevant behavior. By relying only on Ms. Harvey's checklist questionnaire, P.B.P.'s second grade checklist report card, and the checklist evaluation form completed by a non-examining consultant with disability determinations, the ALJ failed to consider extensive and detailed evidence demonstrating P.B.P.'s significant impairments in social functioning and interacting with others. Indeed, a review of the record as a whole shows there to be substantial evidence which largely went unconsidered by the ALJ, contrary to the mandates of the Regulations.

Substantial evidence showed P.B.P.'s impaired social functioning through inappropriate externalized actions, as demonstrated by evidence of P.B.P.'s multiple episodes of running from the classroom; running away from school, requiring police intervention; attempting to run from the room during psychological testing; physical aggression toward teachers and students; attempts to bite teachers who are trying to help him; turning over desks and chairs; charging at teachers and/or students with chairs; and stabbing at an evaluator's clipboard with a pen. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(C)(2)(b), (C)(3). Impaired social functioning is also shown through evidence of P.B.P.'s inappropriate internalized actions, as demonstrated by reports of P.B.P.'s social isolation by playing among peers as opposed to with peers; P.B.P.'s social withdrawal and lack of emotion; speaking in

monologue as opposed to conversational speech; and his preference for one-on-one attention as opposed to being in a regular classroom. <u>Id.</u> P.B.P.'s limited strengths or lack of cooperative behaviors is shown by evidence of extreme competitiveness and lack of tolerance for losing at a game; excessive talking and interrupting; lack of social maturity when coping with imperfections and consequences of his behavior, as manifested by excessive crying, kicking, flailing, and rolling on and licking the floor. <u>Id.</u> There is substantial evidence of P.B.P.'s inappropriate responses to persons in authority, as demonstrated by evidence of P.B.P.'s multiple episodes of aggressive behavior directed toward his teachers, school counselors and resource specialists, as well as aggressive behavior directed toward his psychological evaluators. <u>Id.</u> There likewise is substantial evidence of P.B.P.'s failure to comply with rules, as demonstrated by P.B.P.'s multiple episodes of resistance to teacher instruction; failure to comply with teacher, counselor or evaluator directives regarding behavior; and quitting or disrupting a game or a project because of his unwillingness to lose. 20 C.F.R. § 416.926a(i). P.B.P.'s inappropriate responses to criticism are demonstrated by evidence of P.B.P.'s multiple and consistent episodes of having a "meltdown" when he performs a task incorrectly. <u>Id.</u> Finally, P.B.P.'s disrespect and lack of care for the possessions of others is demonstrated by evidence of P.B.P.'s multiple episodes of

turning over and pushing desks and chairs; throwing items from teachers' desks onto the floor; throwing chairs; attempting to break a school window; kicking file cabinets; lying atop tables and standing atop podiums; and stabbing his evaluator's clipboard with a pen. Id. The ALJ's analysis is devoid of any discussion regarding this significant and relevant evidence of P.B.P.'s impaired social functioning and ability to interact with others.

In addition, although the Regulations mandate that the Commissioner must consider the intensity, frequency and duration of any impaired social functioning, the ALJ failed to do so here despite substantial record evidence of continued and consistent inappropriate social behaviors (e.g., multiple psychiatric hospitalizations in first grade due to aggressive behavior at school; four out-of-school suspensions in first grade imposed within a seven-month period due to dangerous or threatening behavior; forty-four additional behavioral interventions required in first grade within a ten-month period, with such interventions lasting from fifteen minutes to all day events; continued disciplinary reports in second grade, including police intervention sought on two occasions within a three-month period; threatened out-of-school suspension for the last two months of second grade due to disruptions of the classroom, etc.) Such inappropriate behaviors continued despite prescriptions for and adjustments to psychotropic medications, adjustments to behavior modification

plans at school, and repeated psychological assessments in attempts to properly diagnose and treat P.B.P.'s mental impairment(s).

As set out above, in finding P.B.P. to have less than marked limitations in this domain, the ALJ did not address relevant evidence in the record and failed to provide any reason why such evidence should be discounted or not considered. Nor did the ALJ address the special educational settings and accommodations provided to P.B.P., as required by the Regulations, and the effect such settings had on P.B.P.'s functional abilities in this domain. 20 C.F.R. § 416.924a(b)(7)(iv) ("[W]e will consider that good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments."). See also 20 C.F.R. § 416.924a(b)(5)(iv). Although an ALJ is not required to explain all the evidence of record, Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000), he nevertheless cannot merely "pick and [choose] only evidence in the record buttressing his conclusion." Taylor o/b/o McKinnies v. Barnhart, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004), and cases cited therein.

> The ALJ may have considered and for valid reasons rejected the . . . evidence proffered . . . ; but as he did not address these matters, we are unable to determine whether any such rejection is based on substantial evidence. Initial determinations of fact and credibility are for the ALJ, and must be set out in the decision; we cannot speculate whether or why an ALJ rejected certain

evidence. Accordingly, remand is necessary to
fill this void in the record.

<u>Jones v. Chater</u>, 65 F.3d 102, 104 (8th Cir. 1995) (citation
omitted).


In addition, the undersigned notes that, in finding
P.B.P. to suffer less than marked limitations in the domain of
Interacting and Relating with Others, the ALJ relied on the
disability ratings form completed in April 2008 by Ms. Sullivan, a
non-examining consultant for disability determinations. Generally,
opinions of non-examining sources are given less weight than those
of examining sources. <u>Wildman v. Astrue</u>, 596 F.3d 959, 967 (8th
Cir. 2010). This is especially true where, as here, the non-
examining source gives her opinion in a checklist format and "did
not have access to relevant medical records, including relevant
medical records made after the date of evaluation." <u>McCoy v.
Astrue</u>, 648 F.3d 605, 615-16 (8th Cir. 2011); <u>Holmstrom v.
Massanari</u>, 270 F.3d 715, 721 (8th Cir. 2001). In this cause, at
the time Ms. Sullivan completed this checklist form in April 2008,
she did not have the benefit of subsequent psychological
evaluations completed by Drs. McCoy, Jahan and Horwitz, nor the
subsequent educational reports completed by Ms. Abby, Ms. Jones,
the Salisbury R-IV School District, and Ms. Harvey. When coupled
with the ALJ's failure to address and analyze the relevant evidence
of record demonstrating P.B.P.'s significant social limitations, it
cannot be said that the ALJ's reliance on this non-examining

consultant's opinion was supported by substantial evidence.

In <u>Garrett</u>, the Eighth Circuit found that a child who easily cries and has documented temper outbursts, difficulty controlling anger, suspensions from school for fighting and assaulting a teacher, and significantly younger friends suffers impairments in social functioning which may be considered marked impairments. <u>Garrett</u>, 366 F.3d at 654-55. Despite evidence documenting these types behaviors and others, as well as evidence of their intensity, frequency and duration, the ALJ here failed to consider such evidence in his determination that P.B.P.'s impairments in social functioning and in interacting and relating with others were less than marked.

A review of the record as a whole shows substantial evidence establishing that P.B.P. has significant limitations in social functioning. The evidence as summarized above shows P.B.P. to be a child whose impairments interfere with his ability to relate with other children, respond appropriately to adults, and respond to social environments through appropriate interpersonal behaviors. Such interference continues despite repeated adjustments to behavioral intervention strategies as well as adjustments to P.B.P.'s psychotropic medications.

## VI. Conclusion

Accordingly, in light of the ALJ's failure to consider all of the relevant evidence of P.B.P.'s impaired social

functioning in accordance with the Regulations, the ALJ's determination regarding the extent to which P.B.P. experiences limitations in social functioning and in his ability to interact and relate with others is not supported by substantial evidence on the record as a whole. The matter must therefore be remanded to the Commissioner for a proper assessment of such limitations resulting from P.B.P.'s mental impairment. Although plaintiff requests an outright award of benefits, it would be inappropriate at this time to make such an award because the current record does not conclusively demonstrate that P.B.P. is disabled.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and that the cause be remanded to the Commissioner for further proceedings.

Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this  _27th_  day of September, 2011.